*772 The opinion of the Court was delivered by
Bermudez, 0. J.
This is an action to fix a liability on the defendant, with privilege on certain of its assets, represented asresultingfrom the ownership by the plaintiff, of certain bonds of the State and equivalents therefor, due and guaranteed by the corporation, by a, pledge of stock mortgage notes held by the Association. The plaintiff further claims that an Act of the Legislature of 1878, which extends the time of payment of those bonds or annexes, and which provides for the liquidation of the affairs of the Association in a particular mode, and which diverts the application of its funds to the purchase of State Consolidated Bonds, impairs the obligations of the contract by which the “ reimbursement ” of his claim is secured, and is thus unconstitutional and void. The prayer is: that there be judgment for the amounts claimed, with interest from the date of failure of payment, both on the amount of the bonds and annexes, and on the dividend coupons ; that the Act of 1878be annulled; that the liquidation of the concern be speedily proceeded with ; that receivers or commissioners be appointed, and eventually, that the directors of said Association be commanded to proceed to the seizure and sale of all the property mortgaged by the stockholders, and to render accounts of their administration ; finally, that an injunction issue to prevent the investment of the assets of the Association in Consolidated State Bonds.
The defendant pleaded the general issue and prescription. The State intervened, joining in the defense.
From ajudgmentin favor of plaintiff, except as to the interest claimed on the dividend coupons and the entire annulment of the Act of 1878, the defendant and the State have appealed. The plaintiff and appellee prays here for an amendment, of the judgment, by the allowance of the interest claimed on the coupons, and the appointment of one or more receivers, as asked in the original and supplemental petitions.
I.
By its charter, (No. 96 of 1827) the corporation was authorized to borrow $2,000,000 on its bonds, payment of which was to be guaranteed by the mortgage obligations furnished by each stockholder, in order to secure the payment of his subscription.
In general, money corporations derive the capital with which they transact business from the subscriptions of stockholders, paid either entirely in cash, or partly in cash and partly by notes. In this instance, there was no cash payment at all. Each stockholder subscribed for a number of shares of $500 each, and gave amortgage to secure the payment of such shares; the obligations thus incurred, with the security thereof, to remain in possession of the corporation’s representatives, *773 wherewith to procure money and to operate in banking' speculations. That is the mode usually followed by property banks to raise a capital.
The scheme authorized by the Act of 1827 proving' unsuccessful, the Legislature of 1828 passed an Act, (No. 19, p. 130) whereby the sum authorized to be borrowed was raised by half a million, and the amount to be subscribed for was increased by a million, the surplus to be secured likewise, by mortgage, as- previously required. With a view to facilitate the corporation in its • dealings, and in consideration of a bonus of one million of dollars of stock, conceded under certain terms and conditions, the State consented to issue her own bonds for' $2,500,000, to be disposed of by the endorsement of the bank, pledgingher faith to the payment thereof, but requiring the bank, upon whom the debt was fastened, to secure the payment thereof by a pledge, not only of all the hypothecary obligations of her stockholders, but also of those of other “ individuals” dealing with her, the same to remain in the officers of the bank, to guarantee such payment.
There can be no question that, by the legislation of that year and of the following years, the debt evidenced by those bonds and by the annexes issued subsequently to cantle the principal obligation into instalments and make them payable at stated periods, — the debt was not only the debt of the State, but likewise that of the corporation, both the State and the corporation having received a consideration for the issuance of those evidences of indebtedness and unconditional obligations to pay money.
An attentive examination of the other Acts of 1835, p. 123, Secs. 5 and 6 ; of 1842, No. 98; of 1843, No. 92; of 1847, No. 100; of 1853, No. 113; of 1866, No. 38, and even the Act of 1878, No. 20, whatever that last Act be, coupled with the glaring fact that, from first to last, payment was effected on the debt by the bank, proves, beyond the possibility of a doubt, that both the State and the bank considered that the debt was their own, one for which they were both bound primarily as principals, and strange to note, almost a paradox, also as sureties ; the one. for the other, the one pledging negotiable securities, the other its faith as a sovereign, both in favor of bondholders.
The validity and effect of this contract, which is a triangular or tripartite contract, cannot be tested or regulated by the general law in all respects.
This is not the case of a contract covered by a law, or of a law covering a contract; it is the case of a law which is a contract, and a contract which is a law, presenting a physiognomy entirely sui generis.
There can be no earthly doubt that the security or guarantee given by Section six of the Act of 1828, for the 11 reimbursement” of the borrowed capital, was given primarily in favor of the bondholders, and *774 secondarily in favor of the State. That Section provides that the mortgage obligations subscribed by the stockholders and all other mortgage obligations subscribed by ‘'individuals,” in favor of the Association, shall be deposited in the offices of the institution for safe keeping, as a special guarantee and security for the “ reimbursement” of the capital of $2,500,000, and the interest thereof, inasmuch as the said Consolidated Association is bound for the reimbursement of said bonds subscribed by the State, at their respective instalments, (maturities) and to pay the semi-CMiimal interest, until the ivhole amount of the principal is reimbursed. 7 A. 319 ; 2 A. 416, 776, 835.
The significant word “ reimbursement,” wisely used more than once, suggests that of a return of money, of the putting back of money in the purse of one who had taken it out of it; in otherwise, disbursed it. No reimbursement can take place when there has been no disbursement. Who was it that made the disbursement? Evidently not the State, who had lent, not money, but only her credit; but those who took their money from their purses and invested it in the purchase of the bonds, on the faith of the State.and .of the securities of the bank, legally pledged. It is to those bondholders, first, that a “ reimbursement,” or payment, was contemplated. Now it might have well happened that the State might have honored her obligations, at maturity, in case of a failure by the bank to have done so. Then the State would have paid her bonds; and in the absence of a stipulation in her favor, she would, by such payment, have been legally subrogated to the rights of the bondholder, without .a right of competition, however, with other bondholders, if any. R. C. C. 2162; C. N. 1252; Marcadé 4, p. 547; Duranton 12, 289; 2 R. 244; 20 A. 359; 30 A. 618; 31 A. 859; 33 A. 591.
The dominant idea was that the bank was liable and should pay, and should provide, for payment, by a security, and that the State would be also primarily bound.
In such a case of payment by the State, the guarantee furnished to secure satisfaction of the obligation, by reimbursement, would have enured in her favor, not only in her rights, as subrogated ,<nib modo, but also because of a like stipulation in her favor.
We do not attach any importance either way to the dictum in 30 A. 1151, apparently questioning the liability of the bank for the bonds, by reason merely of the endorsement. No question at issue justified it. •A reference to the authorities cited does not show it to be founded.
The case in 15 Howard, 317, is rather indicative of a liability by endorsement, where a liability for the debt, evidenced by the instrument, was imposed by the charter, in case of negotiation. In Lis able opinion, the District Judge has well analyzed and criticised the second *775 ease, and shown the existing disparity, its consequent inapplicability, for a similar reason to that now before this Court.
It is patent that the obligations were issued by the State for the use of the bank; that, under contract and for consideration received, both are liable. The liability of the State was judicially recognized. 30 A. 617, 1153.
She was compelled to fund the same. It is clear that the debt was a debt contracted for and by, at the same time, the corporation, and that the payment of it was secured by her, as already stated, and that it has several times obtained respites and indulgencies, and has, by the course pursued in the transaction of her business, particularly in relation to those bonds and annexes, recognized and acknpwledged her responsibility therefor.
It is more than manifest that the obligations sued on were honored neither by the Association nor by the bank and, therefore, that the bondr holders are creditors of both, with a right to hold them, under the contract, liable solidarily.
It is undeniable that if the State had paid the bonds and annexes, in keeping with the pledged faith, she could have brought an action against the defendant and revendicated the privilege and security, to which the jdaintiff says that he is entitled, and which the defendant has judicially admitted, in these proceedings, having given to the State.
What rights the State, in that hypothesis, could have asserted and vindicated and cannot assert and vindicate, owing to non-payment, the bondholders are entitled, under the law, to allege and enforce.
It is elementary that a creditor has the right to aver and cause to be satisfied, all the rights which his debtor could, if acting, propound and have recognized and executed.
Otherwise, the creditor would be at the mercy of a defaulting,and obstinate debtor, who might, by a refusal to join, or a neglect to assert rights involving his ownership and title to property and its possession, prevent the enforcement of just claims. Cod. lib. 4, tit. 15, arg. ex. leg. 66; R. C. C. 1990, etseq.; C. N. 1166; 2 A. 782, 843; 30 A. 727; 33 A. 898, 906; 4 Marc. 433; Toull. t. 6, n. 370, et seq.; t. 7, n. 560, et seq.; Duranton, t. 10, 552; Grenier Hyp. t. 1, pp. 80, 84, 517, 554; Mourlon, vol. 2, p. 614, et seq.; J. P. 1853, vol. 2, p. 294.
It is clear, however, in this case, that the clause of “ reimbursement ” was primarily stipulated in favor of the bondholders, and that liability of the bank derives not only from the endorsement, but also from the charter and from Statutes subsequently passed, proclaiming her responsibility.
In 30 A. 616, the Court declared that her liability had been added to that of the State.
*776 The declaration in the endorsement was a superfluity for the incurring of the obligation, which already existed and was not thereby absolutely created. The indorsement was, however, a legal formality required for the negotiability of the obligations or bonds.
II.
It is clear that, as the payment or reimbursement of those bonds and annexes was ah initio, and has uninterruptedly continued to be, secured by the pledge of the hypothecary obligations of the stockholders and of other “individuals,” subscribed in favor of rhe bank, the subsistence-of the pledge is a constant recognition of the debt, which, it is not claimed, has been extinguished, otherwise than by prescription.
It is no objection that the object or thing pledged was not delivered to the creditor. Even in the absence of a law contract, it is lawful to stipulate that the pledge may remain in trust, in the hands of a third person, even in those of the debtor, provided it be held precariously. But this objection is untenable in a case like the present one, in which the State, the law-making power, who has the right to derogate from its ordinary legislation, has provided expressly and unequivocally that, it should bo done.
As long as the debt thus secured remains unpaid, and the pledge continues in existence, whatever be the time elapsed since maturity, the defense of prescription cannot be raised. V. 32 A. 1250; 33 A. 1444, and authorities cited in each case; 96 U. S. S. C. p. 476; Dig. lxiii, t. vii, 1. 35, 37 ; C. N. 2076.
III.
The complaint of the plaintiff against the Act of 1878, is well founded, as far as that Act assumes to postpone the payment of the outstanding bonds, without the consent of the holders thereof.
The plaintiff distinctly declares that he has not acquiesced in, and protests against such extension. His declaration is not disproved. The respite sought to be granted by the Act impairs the obligation of the contract, evidenced by thelegislation which the plaintiff invokes, and upon which he plants himself. Anterior indulgences were properly procured with the formal assent of the creditors. But the plaintiff has no right to complain of the tedious mode of the liquidation provided by the legislature, in the absence of any other mode previously stipulated, and which could have been invoked as an integral part of the contract. 7 A. 319.
' The remedy prescribed for the evil appears to be adequate and not to be injurious. It is such that the plaintiff and all others similarly situated must endure, even if obnoxious or unsatisfactory.
1 There can be no doubt that the Act of 1878, in so far as it directs the *777 investment of the funds of the Association in the Consolidated Bonds of the State, is an unauthorized diversion of the assets of an insolvent concern, in liquidation, for the acquisition of property, for speculative purposes, when the same should primarily be'applied to the extinction of its ancient, legitimate, legal outstanding indebtedness, and that such diversion impairs the obligation of the contract of the plaintiff and all other creditors in whose favor the property of the Association must stand and bo dealt with as a common pledge, which it is, unquestionably. R. C. C. 1968, 3183; 12 Cal. 300; 7 Cal. 579; 31 Penn. 175, 185; 10 Cal. 563, 584; 19 Cal. 11; 10 Fla. 112; 2 Woods, 48, 108, 128; 2 Black. 448; 6 How. 301; 4 Litt. 47; 2 How. 608; 3 Wash. 313; 11 Mo. 744; 1 Mo. 164; 6 Otto. 448, 598; Southern Bank vs. Pilsbury, lately decided by U. S. S. C., not yet reported.
IV.
The plaintiff is clearly entitled to the interest claimed on the overdue coupons, and it should have been allowed him. 8 Otto, 473; 13 Otto, 683; 28 A. 560; 33 A. 391, 668, 672.
It is, therefore, ordered and decreed, that, in so far as it refused the interest on the coupons, the judgment appealed from he reversed, and that it he now amended by allowing- said interest. It is further ordered and decreed, that thus amended it be affirmed, with costs.
Mr. Justice Fenner recuses himself, on the ground of interest.
Levy, J., absent.